# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Wallace Steve Perry, Petitioner.

Appellate Case No. 2017-001965

_____

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

_____

Appeal from Greenville County
Edward W. Miller, Circuit Court Judge

_____

Opinion No. 27963
Heard March 6, 2019 – Filed May 6, 2020

_____

## REVERSED

_____

Kerri Rupert, Murphy & Grantland, P.A., of Columbia; Chief Appellate Defender Robert Michael Dudek, of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson, Senior Assistant Deputy Attorney General John Benjamin Aplin, and Assistant Attorney General Vann Henry Gunter Jr., all of Columbia; Solicitor William Walter Wilkins III, of Greenville, for Respondent.

**JUSTICE FEW:** Wallace Steve Perry was convicted on two counts of criminal sexual conduct (CSC) with a minor in the first degree and two counts of CSC with a minor in the second degree for sexually assaulting two of his biological daughters. We find the trial court erred by not excluding under Rule 404(b) the testimony of Perry's stepdaughter that Perry also sexually assaulted her more than twenty years earlier. We reverse and remand for a new trial.

## I. Facts and Procedural History

In 1993, Perry met and began dating Laura Jones. Perry and Jones never married, but had two sets of twins together. Daughter One and Daughter Two were born in 1994. Daughter Three and a son were born in 1996. Perry and Jones separated in 2000, and agreed Perry would have visitation with the children on weekends. In 2012, Daughter Three told Jones that Perry sexually assaulted her during visitation. Daughter Two then told Jones that Perry also sexually assaulted her.

### A. Daughter Two's and Daughter Three's Testimony

Daughter Two testified at trial that after Perry and Jones separated, Perry moved into a three-bedroom apartment. She shared a bedroom in the apartment with her sisters. Daughter Two testified Perry first sexually assaulted her when she was between five and seven years old. When asked about the first incident, Daughter Two stated she was on Perry's bed watching television when he entered the room, lay down next to her, and digitally penetrated her vagina. After the first incident, Perry began sexually assaulting her almost every weekend during visitation. She testified that around 5:00 or 6:00 a.m. on Saturday and Sunday mornings, Perry would get in the bed she shared with her sisters and digitally penetrate her. She testified the assaults generally involved the use of physical force. Specifically, she testified, "He'd lay in the bed. I would try to pull away from him, but he would grab me with a tighter force so I couldn't get away." She also testified Perry committed oral sexual assault on her on two occasions. The first instance occurred after she fell asleep in a chair watching a movie with her brother and sisters. The second instance occurred in the bedroom she shared with her sisters. She testified Perry said if she told anyone about what happened, she "would get in just as much trouble as he would" and she would be taken away from Jones. Daughter Two stated Perry stopped sexually assaulting her

when she was about sixteen years old, and she told Jones about it shortly after Daughter Three did.

Daughter Three testified Perry began sexually assaulting her when she was approximately ten or eleven years old. She testified Perry would come into the bedroom around 5:00 or 6:00 a.m. and get in bed with them. She testified Perry digitally penetrated her vagina on five occasions, but the assaults did not progress beyond digital penetration and did not involve any use of physical force. She testified Perry stopped assaulting her before she reached the age of twelve. After it ended, Daughter Three continued visiting Perry on weekends until she told Jones about it when she was around sixteen. Daughter Three explained she waited to tell Jones because Perry said if she ever told anyone she would get in trouble, and she would be taken away from Jones.

### B.      Stepdaughter's Testimony

Prior to Perry's trial, the State made a motion to admit the testimony of Perry's stepdaughter from an earlier marriage that Perry sexually assaulted her twenty-two to twenty-seven years earlier. The State argued the trial court should not exclude the stepdaughter's testimony under Rule 404(b) of the South Carolina Rules of Evidence because it fit the "common scheme or plan" exception. *See* Rule 404(b), SCRE ("Evidence of other crimes, wrongs, or acts . . . may . . . be admissible to show . . . the existence of a common scheme or plan . . . .").

During the pre-trial hearing, the stepdaughter testified that when she was nine years old, Perry entered her room during the night and digitally penetrated her vagina. According to the stepdaughter, Perry continued to sexually assault her periodically over the next four years, and she estimated he digitally penetrated her about twenty times. She testified that on one occasion, Perry assaulted her in the bathtub while her mother was at work. She stated she did not tell anyone because Perry threatened her. She testified, "I was told my mom wouldn't believe me and if I said anything he would make me out to be a liar and then he would hurt my family." The stepdaughter finally told her mother when she was fourteen, and they reported the crimes to authorities shortly afterward. Perry was not charged for sexually assaulting his stepdaughter.

Perry objected to the testimony of his stepdaughter, arguing it should be excluded under Rule 404(b) and did not fit the common scheme or plan exception. The trial

court initially reserved ruling on the issue. Later during trial, the court indicated it was inclined to allow the stepdaughter to testify. Perry again objected on the basis of Rule 404(b). The trial court ruled the stepdaughter's testimony was admissible under the common scheme or plan exception.

The jury convicted Perry on all counts, and the trial court sentenced him to thirty years in prison. The court of appeals affirmed. *State v. Perry*, 420 S.C. 643, 803 S.E.2d 899 (2017). We granted Perry's petition for a writ of certiorari.

## II. Analysis

The analysis of the admissibility of the stepdaughter's testimony begins with the question of relevance. *See* Rule 402, SCRE ("All relevant evidence is admissible . . . ."). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. The stepdaughter's testimony was clearly relevant because if Perry committed similar acts of sexual abuse against a minor in the past, he was more likely to have done it this time too.[1] However, Rule 402 also provides relevant evidence may be excluded "as otherwise provided by . . . these rules" or another provision of law.

### A. Rule 404(b)

Rule 404(b) of the South Carolina Rules of Evidence provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent.

Rule 404(b), SCRE.

---

[1] Given the breadth of "Relevant evidence" under Rule 401, SCRE, the stepdaughter's testimony could be relevant for other purposes. We address in section II. E. whether the State argues any other purpose for the testimony.

The rule is often stated in terms of "propensity."

> Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. . . . The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime.

*Michelson v. United States*, 335 U.S. 469, 475, 69 S. Ct. 213, 218, 93 L. Ed. 168, 173-74 (1948); *see also* 3 Michael H. Graham, HANDBOOK OF FEDERAL EVIDENCE § 404:5 (8th ed. 2018) (stating "evidence of the commission of crimes, wrongs or other acts by [the defendant] is inadmissible for the purpose of showing a disposition or propensity to commit crimes"); James F. Dreher, A GUIDE TO EVIDENCE LAW IN SOUTH CAROLINA 35 (South Carolina Bar 1967) ("It is in criminal cases that the law must be the most sternly on guard against allowing the doing of an act to be proved by a propensity to do it."); *State v. Fletcher*, 379 S.C. 17, 26, 664 S.E.2d 480, 484 (2008) (Toal, C.J., dissenting) (stating "evidence of other crimes, wrongs, or acts is not admissible for purposes of proving that the defendant possesses a criminal character or has a propensity to commit the charged crime"). Thus, Rule 404(b) prevents the State from introducing evidence of a defendant's other crimes for the purpose of proving his propensity to commit the crime for which he is currently on trial.

In any criminal case, however, evidence the defendant committed similar criminal acts has the inherent tendency to show this propensity. In the words of Rule 404(b), it "prove[s] the character of [the] person" and "shows[s] action in conformity" with that character. We discussed this tendency in *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923). We stated, "Proof that a defendant has been guilty of another crime equally heinous prompts to a ready acceptance of and belief in the prosecution's theory that he is guilty," and, "Its effect is to predispose the mind of the juror to believe the prisoner guilty." 125 S.C. at 416, 118 S.E. at 807. We described this type of evidence as having "the inevitable tendency . . . to raise a legally spurious presumption of guilt in the minds of the jurors." 125 S.C. at 417, 118 S.E. at 807; *see also* 125 S.C. at 420, 118 S.E. at 808 (stating "such evidence strongly tends to

induce the jury to believe that, merely because the defendant was guilty of the former crimes, he was also guilty of the latter"). Thus, evidence of a defendant's other crimes serves the prohibited purpose of showing he has a propensity to engage in criminal behavior.

The question for a trial court, and for this Court on appeal from Perry's conviction, is whether the evidence also serves some legitimate purpose that is not prohibited by Rule 404(b). The rule provides examples of legitimate purposes, stating evidence of other crimes "may, however, be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent." Rule 404(b), SCRE. To the extent a trial court finds evidence of "other crimes" does serve these dual purposes, the court must determine whether the evidence has sufficient probative force for serving the legitimate purpose that the evidence should be admitted, despite its inherent tendency to serve the improper purpose. This determination is bound up in the trial court's duty to balance—pursuant to Rule 403—the probative value of the evidence for its legitimate purpose against the unfair prejudice that results from its tendency to serve the improper purpose. *See State v. Clasby*, 385 S.C. 148, 155-56, 682 S.E.2d 892, 896 (2009) ("Even if prior bad act evidence . . . falls within an exception, it must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant." (quoting *State v. Gaines*, 380 S.C. 23, 29, 667 S.E.2d 728, 731 (2008)) (citing Rule 403, SCRE)).

Historically, to justify a finding that evidence of other crimes, wrongs, or acts is offered for a legitimate purpose, and thus should not be excluded pursuant to Rule 404(b), South Carolina courts have required a logical relevancy or connection between the other crime and some disputed fact or element of the crime charged. *See, e.g.*, *Gaines*, 380 S.C. at 29, 667 S.E.2d at 731 ("To be admissible, the bad act must logically relate to the crime with which the defendant has been charged."); *State v. Brooks*, 341 S.C. 57, 61, 533 S.E.2d 325, 327-28 (2000) ("If the court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt, and the evidence should be rejected." (quoting *Lyle*, 125 S.C. at 417, 118 S.E. at 807)).

## B.     *State v. Lyle*

Our 1923 decision in *State v. Lyle* is the classic South Carolina case for understanding the admissibility of a defendant's other crimes. *See State v. Anderson*, 318 S.C. 395, 403, 458 S.E.2d 56, 60 (Ct. App. 1995) (calling *Lyle* "the seminal case" on evidence of other crimes); Rule 404(b), SCRE Note (citing *Lyle*). Even after our adoption of the Rules of Evidence in 1995,[2] *Lyle* has been our primary resource for analyzing Rule 404(b) objections and rulings. *See, e.g.*, *State v. Odom*, 412 S.C. 253, 260 n.5, 772 S.E.2d 149, 152 n.5 (2015) (relying on *Lyle* for the interpretation of Rule 404(b), and stating *Lyle* "explain[s] the permissible uses of evidence of prior bad acts"); *State v. Cope*, 405 S.C. 317, 337, 748 S.E.2d 194, 204 (2013) (relying on *Lyle* for the interpretation of Rule 404(b)); *State v. Nelson*, 331 S.C. 1, 9-10 n.11, 501 S.E.2d 716, 720-21 n.11 (1998) (discussing the role of *Lyle* in analyzing other crimes and related evidence).

In *Lyle*, the defendant was charged with issuing a forged check to a bank in the city of Aiken on January 12, 1922. 125 S.C. at 411, 118 S.E. at 805. At trial, the State introduced the testimony of five bankers that the defendant committed similar check forgeries at their banks, two in Aiken on the same day, and three in different cities in Georgia in the weeks leading up to January 12. 125 S.C. at 413-14, 118 S.E. at 806. The defendant was convicted, and appealed to this Court. 125 S.C. at 411, 118 S.E. at 805.

We began our discussion of the admissibility of evidence of the other crimes with this observation,

> [The] contention [the evidence is inadmissible] is grounded upon the familiar and salutary general rule, universally recognized and firmly established in all English-speaking countries, that evidence of other distinct crimes committed by the accused may not be adduced merely to raise an inference or to corroborate the

---

[2] *See* Rule 1103(b), SCRE ("These rules shall become effective September 3, 1995.").

prosecution's theory of the defendant's guilt of the particular crime charged.

125 S.C. at 415-16, 118 S.E. at 807.

We then set forth the standard for admissibility of evidence of other crimes:

> Whether evidence of other distinct crimes properly falls within any of the recognized exceptions noted is often a difficult matter to determine. The acid test is its logical relevancy to the particular excepted purpose or purposes for which it is sought to be introduced. If it is logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime.

125 S.C. at 416-17, 118 S.E. at 807.

We then engaged in the "rigid scrutiny" we held was necessary to control "the dangerous tendency and misleading probative force of this class of evidence." 125 S.C. at 417, 118 S.E. at 807. We explained that evidence of the other forgery crimes committed in Aiken on the same date as the crime charged was admissible because the evidence "refuted the defense of an alibi." 125 S.C. at 418, 118 S.E. at 808. We found this to be a sufficient logical connection between the other Aiken crimes and the crime charged. "[T]he sole issue of fact in the court below was whether the defendant was the identical person who uttered the forged check." 125 S.C. at 411, 118 S.E. at 805; *see also* 125 S.C. at 426, 118 S.E. at 810 (stating "whether defendant was the person who uttered the forged check" was "the only real issue in the case"). The evidence refuted the defendant's alibi because "the two extraneous [Aiken] crimes were committed within a few town blocks as to distance, and within a few minutes, as to time, of the crime charged." 125 S.C. at 418, 118 S.E. at 808. Referring to the two Aiken bankers who testified the defendant committed similar crimes in their banks on the same date and near the same time, we stated,

> When they say in substance that they saw this same person in Aiken in the immediate vicinity of the crime within a few minutes of the time it was committed, and that this

person was the defendant, Lyle, the relevancy of the testimony to the vital issue made is . . . obvious.

125 S.C. at 418, 118 S.E. at 807. We held, "The connection for the purpose of establishing the identity of the accused under the issue raised as to the alibi we think is clear. The testimony of [the two Aiken bankers] was therefore properly admitted upon that ground." 125 S.C. at 418, 118 S.E. at 808. This logical connection as to time and place served the legitimate purpose of identifying the defendant as the perpetrator of the crime and refuting his alibi, without reliance on his propensity to forge checks.

### C. The "Logical Connection" Standard

For over eighty years after our decision in *Lyle*, this Court consistently adhered to its narrow "acid test" of "logical relevancy" or "logical connection" for admissibility of other crimes. *See, e.g.*, *State v. Fletcher*, 379 S.C. 17, 23, 664 S.E.2d 480, 483 (2008) (citing *Lyle* for the proposition the other crimes "must logically relate to the crime with which the defendant has been charged"); *State v. King*, 334 S.C. 504, 512, 514 S.E.2d 578, 582 (1999) ("The record must support a logical relevance between the prior bad act and the crime for which the defendant is accused."); *State v. Parker*, 315 S.C. 230, 234, 433 S.E.2d 831, 833 (1993) (finding no connection between the other crime and the crime charged as required by *Lyle,* reasoning "the present facts only support a general similarity, and thus are insufficient to support the common scheme or plan exception"); *State v. McClellan*, 283 S.C. 389, 392, 323 S.E.2d 772, 774 (1984) ("It would be difficult to conceive of a common scheme or plan more within the plain meaning of the exception than that presented by this evidence."); *State v. Stokes*, 279 S.C. 191, 193, 304 S.E.2d 814, 815 (1983) ("The 'common scheme or plan' exception requires more than mere commission of two similar crimes by the same person. There must be some connection between the crimes."); 279 S.C. at 192-93, 304 S.E.2d at 814-15 (finding the trial judge erred in admitting testimony from a witness who speculated the defendant intended to rape her because there was no connection made between the other act and the act for which the defendant was charged); *State v. Rivers*, 273 S.C. 75, 78, 254 S.E.2d 299, 300 (1979) ("Unable to clearly perceive the connection between the acts as required by *Lyle*, . . . we conclude that the testimony [of the defendant's other acts of sexual misconduct] should have been excluded."); *State v. Whitener*, 228 S.C. 244, 265, 89 S.E.2d 701, 711 (1955) (allowing testimony of an "unnatural" sexual act perpetrated against the same victim some hours after the offense charged because the subsequent

sex act explained why a doctor did not find any sperm during his medical examination).

## D.    *State v. Wallace*

In *State v. Wallace*, 384 S.C. 428, 683 S.E.2d 275 (2009), however, this Court purported to abandon the well-settled "logical connection" standard for analyzing Rule 404(b) objections. The defendant in *Wallace* was charged with CSC with a minor in the second degree for sexually assaulting his stepdaughter. 384 S.C. at 431, 683 S.E.2d at 276. The trial court permitted the State to introduce the testimony of the victim's sister that she also had been sexually assaulted by the defendant. 384 S.C. at 431-32, 683 S.E.2d at 277. The trial court admitted the testimony under the common scheme or plan exception to Rule 404(b), 384 S.C. at 432, 683 S.E.2d at 277, and the jury convicted him, 384 S.C. at 431, 683 S.E.2d at 276.

The court of appeals reversed his conviction. *State v. Wallace*, 364 S.C. 130, 133, 611 S.E.2d 332, 333 (Ct. App. 2005), *rev'd*, 384 S.C. 428, 683 S.E.2d 275 (2009). In an opinion written by then Chief Judge Hearn, the court of appeals "review[ed] the underlying facts of *Lyle* in order to fully understand the common scheme or plan exception." 364 S.C. at 136, 611 S.E.2d at 335. The court also reviewed the primary cases we relied on in *Lyle* to formulate "[t]his notion of a *connection*." *See* 364 S.C. 130, 137-39, 611 S.E.2d 332, 336-37 (discussing *People v. Molineux*, 61 N.E. 286 (N.Y. 1901) and *People v. Romano*, 82 N.Y.S. 749 (N.Y. App. Div. 1903)). The court of appeals found the sister's testimony should have been excluded because "the trial court did not address any connection between the two crimes" and the evidence "falls far short of the threshold for the admission of a prior crime under the common scheme or plan exception." 364 S.C. at 141, 611 S.E.2d at 338. Relying on a decision of this Court, the court of appeals concluded "the appellate courts of this state have refused to recognize a specific exception to the inadmissibility of prior bad act evidence in criminal sexual conduct cases." 364 S.C. at 139, 611 S.E.2d at 337 (citing *State v. Nelson*, 331 S.C. 1, 14 n.16, 501 S.E.2d 716, 723 n.16 (1998); *State v. Tutton*, 354 S.C. 319, 328, 580 S.E.2d 186, 191 (Ct. App. 2003)). Based on *Nelson* and *Tutton*, the court of appeals concluded—we now find correctly so—the trial court erred in finding the evidence fit the common scheme or plan exception simply "because of the close degree of similarity." 364 S.C. at 141, 611 S.E.2d at 338.

In a divided opinion, this Court reversed the court of appeals and reinstated the conviction. 384 S.C. at 435, 683 S.E.2d at 279. For the first time in our jurisprudence, contrary to over eighty years of interpretation of Rule 404(b) and its pre-Rules predecessor *Lyle*, the Court stated, "A close degree of similarity establishes the required connection between the two acts and no further 'connection' must be shown for admissibility." 384 S.C. at 434, 683 S.E.2d at 278; *see* 384 S.C. at 436, 683 S.E.2d at 279 (Pleicones, J., dissenting) ("We have repeatedly held in non-sexual offense cases that, 'the mere presence of similarity only serves to enhance the potential for prejudice,' yet under the majority's view, similarity is the touchstone of admissibility in child sexual offense cases." (citations omitted)); *State v. Perez*, 423 S.C. 491, 502, 816 S.E.2d 550, 556 (2018) (Hearn, J., concurring) (calling the majority opinion in *Wallace* "a marked departure from earlier case law requiring some connection between crimes beyond mere similarity"). We find this statement from—and the reasoning and holding in—our opinion in *Wallace* is based on a misunderstanding of Rule 404(b) and our cases interpreting it, particularly the "seminal" case *Lyle*.[3] The decision in *Wallace* effectively created a new rule of evidence,[4] and rendered meaningless the restrictive application of the common

[3] In a footnote in *Wallace* we stated the court of appeals mis-read *Lyle*. 384 S.C. at 432 n.3, 683 S.E.2d at 277 n.3. The *Lyle* Court did note "the marked similarity in technique of operation, etc.," between the other Aiken forgeries and the crime charged was part of what satisfied the logical connection standard for the other Aiken crimes. 125 S.C. at 418, 118 S.E. at 808. However, the *Lyle* Court also held the same similarity between the Georgia forgeries and the crime charged was not a sufficient connection. We held, "The mere fact that the Georgia crimes were similar in nature and parallel as to methods and technique employed in their execution does not serve to identify the defendant as the person who uttered the forged check in Aiken as charged . . . ." 125 S.C. at 420, 118 S.E. at 808; *see also* 125 S.C. at 427, 118 S.E. at 811 (finding "no such connection was shown to exist between the separate Georgia offenses and the Aiken crime" and thus evidence of the Georgia crimes "was not admissible merely to show plan or system"). In *Wallace*, it was not the court of appeals that misinterpreted *Lyle*. We did.

[4] *See Wallace*, 384 S.C. 428, 436, 683 S.E.2d 275, 279 (Pleicones, J., dissenting) (criticizing the majority's interpretation of Rule 404(b), and stating "if we are to permit the admission of propensity evidence in these types of cases, then we should propose a new rule of evidence"). Federal Rules of Evidence 413 and 414 were added by Congress in 1994, and expressly permit the admission of similar crimes in

scheme or plan exception that is so deeply embedded in our precedent. Concurring in *Perez*, Justice Hearn challenged, "the Court should . . . overturn . . . *State v. Wallace* . . . [because it] so expanded the admissibility of prior bad acts in sexual offense cases that the exception has swallowed the rule." 423 S.C. at 501, 816 S.E.2d at 556 (Hearn, J., concurring). We now overrule *Wallace*.[5]

## E. Admissibility of the Stepdaughter's Testimony

The State did not offer any argument that the stepdaughter's testimony served a legitimate purpose, or that a logical connection exists between Perry's abuse of his stepdaughter and the current charges. The State simply relied on *Wallace*, and argued what it called substantial similarities between the two crimes outweighed any dissimilarities. Therefore, the State argued, the stepdaughter's testimony was admissible. We disagree.

---

sexual assault and child molestation cases. *See* Fed. R. Evid. 413 and 414. However, unlike other states that have adopted versions of Rules 413 and 414, we chose not to adopt these rules with our Rules of Evidence in 1995.

[5] In its opinion in *Wallace*, the court of appeals noted "some of the appellate decisions appear to focus exclusively on the alleged close similarity between the other crime and the crime charged, while others look beyond mere close similarity to consider the system or connection between the two," but stated "sorting out any apparent inconsistencies in the appellate decisions of this state is not the province of [the court of appeals]." 364 S.C. at 139 n.2, 611 S.E.2d at 337 n.2. While doing so is the province of this Court, we do not see the necessity of doing so. Rather than reconsidering the results of prior cases, our focus is on restoring the integrity of the Rule 404(b) analysis that this Court changed in *Wallace*. We do, however, single out one case: *State v. Hallman*, 298 S.C. 172, 379 S.E.2d 115 (1989). *Hallman*, which has never been meaningfully discussed by this Court, does not say no logical connection is required. In its limited analysis, however, *Hallman* offers no explanation of what could have been a sufficient logical connection. Rather, *Hallman* focuses only on similarity. 298 S.C. at 175, 379 S.E.2d at 117. Without an explanation of any logical connection, it is not possible to determine whether *Hallman* is distinguishable from *Wallace*, or from this case. Therefore, we overrule *Hallman*.

First, Perry's sexual assault of his stepdaughter is not substantially similar to his assault of his biological children; nor are the assaults of his children even substantially similar to each other.[6] Perry began sexually assaulting Daughter Two at age five to seven, his stepdaughter at age nine, and Daughter Three at age ten or eleven. He assaulted Daughter Two nearly every weekend for at least nine years until she was sixteen, his stepdaughter periodically over four years until she was thirteen, and Daughter Three five times within an approximate one-year period ending before she turned twelve. He began sexually assaulting Daughter Two in his own bedroom while she was watching television. He began sexually assaulting the stepdaughter and Daughter Three in their bedrooms while they were sleeping. He first assaulted his stepdaughter with digital penetration, committed oral sexual assault on her once,[7] and—according to the solicitor who tried the case—"progress[ed] on into actual vaginal/penile penetration." However, there is no evidence of penile penetration with his biological daughters. Perry did commit oral sexual assault on Daughter Two, but not on Daughter Three. He generally used physical restraint against Daughter Two, but did not use any physical force against his stepdaughter or Daughter Three. Finally, he threatened his stepdaughter with

---

[6] The State made a strategic choice to try the crimes against Daughters Two and Three together. This was permissible because the test for whether the State may do this does not focus on similarity. *See State v. Harris*, 351 S.C. 643, 652, 572 S.E.2d 267, 272 (2002) (listing four considerations for a trial court in deciding whether to try separate crimes in a joint trial). This choice created problems, however, for the State's Rule 404(b) argument. The State's reliance only on similarity to support admission of the stepdaughter's testimony under Rule 404(b) forces the State—and this Court—to examine the lack of similarity between the charged crimes. If the charged crimes are not substantially similar to each other, then Perry's crimes against his stepdaughter can have a "close degree of similarity" to only one of them. Though dissimilarities between charged crimes are not integral to the joinder analysis, the State's choice to try them together made their dissimilarity directly related to the Rule 404(b) analysis.

[7] Although not specifically discussed in her pre-trial testimony, the stepdaughter testified during trial Perry committed oral sexual assault on her on one occasion.

violence against her family if she disclosed what he had done,[8] but neither of his biological daughters testified he threatened any violence.

The State argues the children's ages were similar because "all of the abuse began when the victims were at a pre-pubescent age." This is a clever attempt to make dissimilarities sound similar, but assaulting one child beginning at age five to seven and another at age ten or eleven is not a similarity. Perry began assaulting the stepdaughter at age nine, which is not similar to age five. Age nine may be similar to ten, but in terms of the age at which a sexual predator begins sexually assaulting a daughter, ages nine and seven hardly seem to show "a close degree of similarity." The State also argues the location where the sexual assaults occurred is similar because "the sexual abuse occurred within the home." We find this is too general to be considered a meaningful similarity. The fact Perry began assaulting one child in the father's bedroom and the other children in their own bedrooms is not a similarity. Finally, Perry assaulted his stepdaughter while bathing her in the bathtub, but there is no allegation he did that with his biological daughters.

Certainly, there are similarities. In addition to the general similarities discussed above, the State emphasized the specific similarity that Perry was the only father figure in the lives of each victim. There is nothing in this record, however, that amounts to "a close degree of similarity," as *Wallace* purports to permit. *Wallace*, 384 S.C. at 434, 683 S.E.2d at 278.

We make one final point regarding similarity. Referring to a statement we made in *Lyle*, the State argues "the defendant . . . had a monopoly on the methods and means in committing sexual abuse against these children because he was the father figure in the home." *See Lyle*, 125 S.C. at 420-21, 118 S.E. at 808 (stating, "There is nothing to indicate that the defendant held any monopoly of the methods and means used in passing the forged checks in Georgia, or that they were unique in the annals of crime."). The statement from *Lyle* does not help the State. We made the statement in a passage in which we explained that the required connection cannot be made "from mere naked similarity of the crime." 125 S.C. at 421, 118 S.E. at 808. Our

---

[8] The stepdaughter testified at the pre-trial hearing, "I was told my mom would not believe me and if I said anything he would make me out to be a liar and then he would hurt my family." Threatening physical violence—as testified to by the stepdaughter—is quite different from telling Daughters Two and Three they would get in trouble and be taken away from their mother.

point was that if a defendant did hold a "monopoly" on the method used, or if the "methods and means" were truly unique, then—in contrast to the Georgia crimes in *Lyle*—a good argument could be made that the connection is sufficient. Like the Georgia crimes in *Lyle*, however, Perry's "methods and means" are not unique. Rather, in our significant collective experience dealing with crimes of this nature, a very high percentage of sexual crimes against children are committed just like Perry's alleged crimes: by father figures, in the home, in a bedroom, beginning in the pre-pubescent years. The fact Perry's crimes fit this general pattern does not give Perry a "monopoly" on his criminal method.

Second, the stepdaughter's testimony must serve some legitimate purpose beyond propensity. At oral argument, the State correctly argued, "A piece of evidence can appear to be propensity, but it can also have a proper purpose and be admissible." In support, the State cited *State v. Benton*, 338 S.C. 151, 526 S.E.2d 228 (2000), in which we addressed the admissibility of other burglary convictions to prove an element of first degree burglary. 338 S.C. at 153-54, 526 S.E.2d at 229. Recognizing the inherent tendency of evidence of other crimes to show propensity, we stated, "Propensity evidence is admissible if offered for some purpose other than to show the accused is a bad person or he acted in conformity with his prior convictions." 338 S.C. at 156, 526 S.E.2d at 230. The legitimate purpose for which the State offered the other burglary convictions in *Benton* was "to prove a statutory element of the current first degree burglary charge." *Id.* We specifically noted the State did not offer the convictions for the improper purpose—propensity. We stated the State's purpose was "not to suggest appellant was a bad person or committed the present burglary because he had committed prior burglaries." *Id.*

In this case, however, the State has never suggested there is any legitimate purpose for the stepdaughter's testimony. At trial, the State did not identify any fact in the crimes charged that was made more or less likely to be true by the testimony of the stepdaughter. At oral argument, the Court pressed the State to explain how the stepdaughter's testimony helped the jury to understand the current charges. The State had no answer, instead contending only the crimes were similar under *Wallace*.

As we explained earlier, part of the task of this Court on appeal in this case is to determine whether the stepdaughter's testimony has sufficient probative force for serving a legitimate purpose. Under Rule 403, the danger of the evidence being used only for the improper purpose of propensity must not substantially outweigh the probative value of any legitimate use. With no fact in issue in the crimes charged

that is made more or less likely by the stepdaughter's testimony—other than "he did it"—the probative force lies only in the use of the testimony to prove character, and from that character to prove he acted in accordance. In other words, the stepdaughter's testimony served only one purpose—propensity.

It is not enough to meet the "logical connection" standard for admission of other crimes under the common scheme or plan exception to Rule 404(b) that the defendant previously committed the same crime. "Repetition of the same act or same crime does not equal a 'plan.'" *Perez*, 423 S.C. at 502, 816 S.E.2d at 556 (Hearn, J., concurring) (quoting *Daggett v. State*, 187 S.W.3d 444, 451 (Tex. Crim. App. 2005)). When evidence of other crimes is admitted based solely on the similarity of a previous crime, the evidence serves only the purpose prohibited by Rule 404(b), and allows the jury to convict the defendant on the improper inference of propensity that because he did it before, he must have done it again. *See United States v. Krezdorn*, 639 F.2d 1327, 1331 (5th Cir. 1981) (reversing the district court's admission into evidence of similar forgery crimes because they "would, at best, merely demonstrate the repetition of similar criminal acts, thus indicating [the defendant]'s propensity to commit this crime. Evidence of other crimes is not admissible for this purpose"). Quoting Justice Hearn one final time from her concurrence in *Perez*, "the repeated commission of the same criminal offense [is] offered obliquely to show bad character and conduct in conformity with that bad character." 423 S.C. at 502, 816 S.E.2d at 556 (Hearn, J., concurring) (quoting *Daggett*, 187 S.W.3d at 452).

The common scheme or plan exception demands more. There must be something in the defendant's criminal process that logically connects the "other crimes" to the crime charged. For example, in *McClellan*, we upheld the admission into evidence of other crimes under the common scheme or plan exception because the State proved the defendant used the same particularly unique method of committing two uncharged crimes that he used to commit the charged crime. We explained,

> All three daughters testified concerning the pattern of this and prior attacks. According to them, these attacks commenced about their twelfth birthday, at which time Appellant began entering their bedroom late at night, waking them, and taking one of them to his bedroom. There he would explain the Biblical verse that children are to "Honor thy Father," and would also indicate he was

teaching them how to be with their husbands.  The method
of attack was common to all three daughters.

283 S.C. at 391, 323 S.E.2d at 773.  The defendant in *McClellan* developed a particularized plan for sexually assaulting his children through which he invoked the Bible, placed a duty on the children to "honor" him, and placed himself in the role of "teaching" them to submit to sexual violence.  The fact he carried out his plan in its unique detail when assaulting all three children warranted the admission of the uncharged crimes into evidence.  The evidence had a logical connection to whether a crime was committed and to who committed it.  We emphasize today that *McClellan* represents the proper application of Rule 404(b) and remains good law.

We provide two other examples of the proper use of the common scheme or plan exception with our opinions today in *State v. Durant*, Op. No. 27964 (S.C. Sup. Ct. filed May 6, 2020) (Shearouse Adv. Sh. No. 18 at 64), and *State v. Cotton*, Op. No. 27965 (S.C. Sup. Ct. filed May 6, 2020) (Shearouse Adv. Sh. No. 18 at 75).

In *Durant*, the defendant was charged with CSC in the second degree for sexually assaulting a young girl at the church where the defendant served as pastor.  The State offered into evidence the testimony of three other girls the defendant sexually assaulted as evidence of a common scheme or plan.  We affirmed the trial court's admission of the "other crimes" because the defendant used a "particularly unique method of committing his attacks" and that method was "common to all the girls." We noted there were differences between the crimes, but relying on our opinion in this case, refused to engage in a "mathematical exercise where the number of similarities and dissimilarities are counted."  Rather, we relied on the fact "the method of his attack was more than just similar," it was unique, and because of its uniqueness "'reasonably tended to prove a material fact in issue.'"  *Durant*, (Shearouse Adv. Sh. No. 18 at 64, 68) (quoting *Lyle*, 125 S.C. at 417, 118 S.E. at 807).  As to the particular facts supporting the use of the common scheme or plan exception, we explained,

> Durant exercised his position of trust, authority, and
> spiritual leadership to hold private prayer meetings with
> teen girls who had grown up in his church.  He told them
> he was praying for their health and good fortune, and
> represented that part of this process was touching them
> sexually and having intercourse.  Durant then warned the

girls of misfortune if they refused or told anyone. Moreover, he used scripture as a means of grooming the children into performing sex acts . . . . Indeed, the trial court noted it was one of the more compelling cases of common scheme or plan evidence it has ever seen.

*Durant*, (Shearouse Adv. Sh. No. 18 at 64, 69).

In *Cotton*, the defendant was charged with CSC in the first degree and kidnapping. The State offered into evidence the testimony of another victim who testified the defendant committed a remarkably similar sexual assault and kidnapping against her seven months earlier. We affirmed the admission of the evidence under the common scheme or plan exception. The similarities between the two incidents were extensive. The trial court discussed these similarities at length in its pre-trial ruling. But the "other crimes" evidence in *Cotton* had more than just similarity. As the State argued in its brief in that case, "Even if the similarities alone are not sufficient for admission of the testimony, the testimony clearly establishes a logical relevance to the underlying crime." Brief for Resp't at 18, *State v. Cotton,* (Shearouse Adv. Sh. No. 18 at 75). The State went on to explain its theory of a logical connection to a specific, disputed fact.[9] In addition, the trial court in *Cotton* conducted an extensive, on-the-record analysis of the balance between the unfair prejudice that would result from the evidence against the probative value in the logical connection. "Using the new framework set forth in [this case], we [found] the admission of the second victim's testimony satisfied the requirements of Rules 404(b) and 403, SCRE," and we affirmed. *Cotton*, (Shearouse Adv. Sh. No. 18 at 75, 77).

### III. Conclusion

As we said in *Lyle*, "Whether evidence of other . . . crimes properly falls within any of the recognized exceptions . . . is often a difficult matter to determine." 125 S.C. at 416-17, 118 S.E. at 807. Rule 404(b) of our Rules of Evidence provides, "Evidence of other crimes, wrongs, or acts . . . may . . . be admissible to show . . .

---

[9] The defendant denied being with the victim on the day of the crime, and offered an innocent explanation of how his DNA was found on the victim's clothing. The State argued the "other crime" refuted his alibi because "the existence of the prior bad act refuted Petitioner's contention regarding how his DNA appeared on the victim's jeans." Brief for Resp't at 10, *State v. Cotton,* (Shearouse Adv. Sh. No. 18 at 75).

the existence of a common scheme or plan . . . ."  The trial court's standard for making this determination is the *Lyle* "logical connection" test.  The State must demonstrate to the trial court that there is in fact a scheme or plan common to both crimes, and that evidence of the other crime serves some purpose other than using the defendant's character to show his propensity to commit the crime charged.

Similarity can be important to meeting that burden, but as we held in *Lyle* and in all our decisions for over eighty years afterward, there must be more.  The State must show a logical connection between the other crime and the crime charged such that the evidence of other crimes "reasonably tends to prove a material fact in issue."  125 S.C. at 417, 118 S.E. at 807.  The State must also convince the trial court that the probative force of the evidence when used for this legitimate purpose is not substantially outweighed by the danger of unfair prejudice from the inherent tendency of the evidence to show the defendant's propensity to commit similar crimes.  Rule 403, SCRE.  Whether the State has met its burden "should be subjected by the courts to rigid scrutiny," considering the individual facts of and circumstances of each case.  125 S.C. at 417, 118 S.E. at 807.  In this case, the State did not meet its burden.

We **REVERSE** Perry's convictions and **REMAND** for a new trial.

**BEATTY, C.J., and HEARN, J., concur.  KITTREDGE, J., dissenting in a separate opinion in which JAMES, J., concurs.**

**JUSTICE KITTREDGE**:  Admissibility of Rule 404(b) prior bad acts evidence[10] often presents thorny and difficult issues on which reasonable minds can differ.  While I agree with the majority that a careful review of the common scheme or plan exception to Rule 404(b) is warranted, I believe the majority goes too far in overruling *State v. Wallace*[11] and *State v. Hallman*.[12]  As described below, I believe this Court's historic approach to common scheme or plan evidence requires a showing that the prior bad acts are somehow connected to the charged crime.  Importantly, similarities between the prior bad acts and the charged crime may sometimes, but not always, establish the requisite connection, in that the similarities standing alone may establish the defendant has a common criminal system that he repeatedly implements.  *See, e.g.*, *State v. Bell*, 302 S.C. 18, 28–29, 393 S.E.2d 364, 370 (1990) (determining the prior bad acts evidence "connected Bell to the commission of the murder . . . by demonstrating the similarities between the [other two] murders"); *State v. Tutton*, 354 S.C. 319, 328, 580 S.E.2d 186, 191 (Ct. App. 2003) ("Where there is a pattern of continuous misconduct, as commonly found in sex crimes, that pattern supplies the necessary connection to support the existence of a plan."); 2 John Henry Wigmore & Arthur Best, *Wigmore on Evidence* § 304 (Chadbourn rev. 1983 & Supp. 2020-1) (explaining admissibility is not conditioned on "merely a similarity in the results, but [on] such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are individual manifestations" (emphasis omitted)).

Regrettably, through the years and many appellate decisions, our courts have employed the shorthand phrase of "similarities" to encompass the connection test.  *See, e.g.*, *State v. Cope*, 405 S.C. 317, 337, 748 S.E.2d 194, 204 (2013).  In *Wallace*, the defendant specifically sought to ensure that the connection test remained viable, pointing to *Tutton* to support his contention a

---

[10] *See* Rule 404(b), SCRE ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent.").
[11] 384 S.C. 428, 683 S.E.2d 275 (2009).
[12] 298 S.C. 172, 379 S.E.2d 115 (1989).

connection was required. *Wallace*, however, held that similarity alone was sufficient for admission of the prior bad acts evidence, thus rejecting the connection test. *See Wallace*, 384 S.C. at 434 n.5, 683 S.E.2d at 278 n.5. In my judgment, *Wallace* wrongly rejected the connection test. I would modify *Wallace* by restoring the connection test to the Rule 404(b) common scheme or plan exception, but allow similarities between the prior bad acts and the charged crime to show the connection. When *Wallace* is so modified, its framework fits well with this Court's extensive common scheme or plan jurisprudence, including *Hallman* and many other cases.

While I do not believe *Wallace* and *Hallman* should be overruled, there is much in common with the analytical frameworks advanced by the majority and my dissent. We part company on the proper result in this case. Because it is my judgment the court of appeals properly affirmed the trial court's exercise of evidentiary discretion in the admission of the stepdaughter's prior bad acts testimony, under *Wallace* as I would modify that decision, I would affirm the convictions of Petitioner Wallace Steve Perry. In addition, I am concerned that the majority opinion can be read to rewrite Rule 404(b) to require a *unique* scheme or plan rather than a *common* scheme or plan.

Today, the Court has filed two other opinions affirming convictions that involved challenges to Rule 404(b) common scheme or plan evidence. *See State v. Durant*, Op. No. 27964 (S.C. Sup. Ct. filed May 6, 2020) (Shearouse Adv. Sh. No. 18 at 64); *State v. Cotton*, Op. No. 27965 (S.C. Sup. Ct. filed May 6, 2020) (Shearouse Adv. Sh. No. 18 at 75).[13] Perhaps in affirming the admission of Rule 404(b) common scheme or plan evidence in *Durant* and *Cotton*, today's decision overruling *Wallace* may not foreshadow a significant change in the admission of Rule 404(b) evidence in our trial courts. Nevertheless, today's decision not only claims to repudiate *Wallace* and *Hallman*, it calls into question much of our jurisprudence in the 404(b) arena,

---

[13] In *Durant* and *Cotton*, we were asked to overrule *Wallace*; in this case, we were not. Nevertheless, I do not criticize the majority for reexamining *Wallace* today, for *Wallace*'s "similarity only" framework is contrary to our jurisprudence.

including, among many other cases, *State v. Whitener*,[14] *State v. Cope*,[15] and *State v. Tutton*.[16] The overruling of *State v. Hallman* in particular appears gratuitous and unnecessary, even if *Wallace* is to be cast aside.[17] Perhaps the decisions today in *Durant* and *Cotton* indicate my concern is unfounded. Time will tell.

I have further decided to include my view of *State v. Lyle*.[18] *Lyle* has been frequently cited as a landmark case concerning common scheme or plan evidence. However, I have long believed that *Lyle* is primarily an identity case, with only a cursory reference to the common scheme or plan exception. *See* Rule 404(b), SCRE (listing identity as another exception to the prohibition on prior bad acts evidence). I regret the length of this opinion, for I am aware of the burden on judges and, especially, practitioners to review opinions as they strive to keep pace with appellate court decisions. Yet with the majority's revision to our common scheme or plan evidence law and reliance on *Lyle*, I feel obligated to correct the record, as I see it, as to *Lyle*'s proper place in our Rule 404(b) jurisprudence.

# I.

I begin with the charges against Petitioner. He was indicted on two counts of criminal sexual conduct with a minor in the first degree and two counts of criminal sexual conduct with a minor in the second degree. A jury convicted Petitioner on all counts. The victims are Petitioner's daughters. The State introduced evidence of Petitioner's sexual abuse of his stepdaughter (Stepdaughter) years earlier. The experienced trial judge admitted this Rule 404(b) evidence under the common scheme or plan exception. In a well-

---

[14] 228 S.C. 244, 89 S.E.2d 701 (1955).

[15] 405 S.C. at 317, 748 S.E.2d at 194.

[16] 354 S.C. at 319, 580 S.E.2d at 186.

[17] *See, e.g.*, *State v. Parker*, 315 S.C. 230, 233, 433 S.E.2d 831, 832 (1993) ("The analysis adopted in *Hallman* was a clarification of the *McClellan* [] test." (citing *State v. McClellan*, 283 S.C. 389, 323 S.E.2d 772 (1984))). Despite the majority overruling *Hallman*, the Court—as a whole—reaffirms the continued viability of *McClellan* today in *Perry*, *Durant*, and *Cotton*.

[18] 125 S.C. 406, 118 S.E. 803 (1923).

reasoned opinion, the court of appeals affirmed. *State v. Perry*, 420 S.C. 643, 803 S.E.2d 899 (Ct. App. 2017). I would affirm the court of appeals and uphold Petitioner's convictions for sexually abusing his daughters.

## A.

At the time of the alleged abuse, Petitioner and the victims' mother had separated, and the children visited Petitioner on weekends.

The victim referred to as Daughter Two was twenty years old at the time of the trial. Daughter Two testified Petitioner began molesting her when she was between five and seven years old. The first instance of abuse occurred when Daughter Two was lying in bed watching television; Petitioner lay next to her and digitally penetrated her vagina. Petitioner continued to molest Daughter Two for many years, typically entering her bedroom around five or six o'clock in the morning during the children's weekend visitations. The abuse consisted of digital penetration for the most part, although Petitioner performed oral sex on Daughter Two on two occasions. Petitioner sexually molested Daughter Two until she was fifteen years old. Daughter Two did not disclose the abuse because Petitioner threatened her, telling her that she "would get in just as much trouble as he would" and would be taken away from her mother.

The victim referred to as Daughter Three was eighteen years old at the time of the trial. Daughter Three testified Petitioner began abusing her when she was around ten or eleven years old. According to Daughter Three, on five different occasions, Petitioner came into her bedroom around five or six o'clock in the morning and abused her by digitally penetrating her vagina. Similar to Daughter Two, Daughter Three did not disclose the abuse for several years because Petitioner threatened her, telling her that she would get "in trouble and [would] get taken away from [her] mom."

Ultimately, Daughter Three reported Petitioner's abuse, which emboldened Daughter Two to come forward and report her own abuse.

**B.**

Over Petitioner's objection, and following a proffer outside the presence of the jury, the trial court admitted the testimony of Stepdaughter under the common scheme or plan exception to Rule 404(b), SCRE, finding there was clear and convincing evidence Petitioner had abused Stepdaughter. Stepdaughter was thirty-six years old at Petitioner's trial. According to Stepdaughter, when she was around nine years old, Petitioner began abusing her. She testified that while she was between nine and thirteen or fourteen years old, Petitioner came into her room multiple times and digitally penetrated her vagina, and that on another occasion, he performed oral sex on her.[19] Stepdaughter explained the abuse occurred most often in her room, although "one incident [occurred] in the bathtub." Stepdaughter testified she did not report the abuse at the time it occurred because Petitioner threatened her and she "was scared [her] family would be hurt." Nonetheless, Stepdaughter reported Petitioner's abuse when she was fourteen years old. No charges were filed against Petitioner in connection with the abuse of Stepdaughter, in part because Stepdaughter was pregnant and, quite understandably, in a fragile state. Instead, Petitioner was allowed to enter a pretrial intervention program.

**II.**

Petitioner argues on appeal there was not a close degree of similarity between the allegations of his abuse of Stepdaughter and the allegations of his abuse of Daughters Two and Three. More to the point, Petitioner contends there are several dissimilarities between the charged crimes (involving Daughters Two and Three) and the prior bad acts evidence (involving Stepdaughter). I

---

[19] Petitioner's abuse of Stepdaughter allegedly advanced to sexual intercourse, but the trial court found this testimony was not allowed because its probative value was substantially outweighed by the danger of unfair prejudice. *See* Rule 403, SCRE; *Wallace*, 384 S.C. at 435, 683 S.E.2d at 278 (permitting the trial court to "redact dissimilar particulars of sexual conduct to avoid unfair prejudice to the defendant").

disagree the differences take Petitioner's actions against his three victims out of the realm of a common scheme or plan to abuse his daughters.

The court of appeals thoroughly, and properly in my firm judgment, analyzed Petitioner's challenge to the prior bad acts evidence. The abuse of Stepdaughter and the abuse of Daughters Two and Three were not identical in every respect, and the court of appeals so acknowledged. However, the law does not require the prior bad acts evidence to be *exactly the same* as the charged crime. The court of appeals examined the similarities in light of the law concerning the common scheme or plan exception to Rule 404(b). The court of appeals noted the "close degree of similarity" and observed: (1) the child molestation occurred during the victims' preteen and early teenage years; (2) a parent-child relationship existed between Petitioner and all of the victims; (3) the victims were molested in Petitioner's residence; (4) the abuse typically occurred in the victims' bedrooms; (5) Petitioner threatened all of the victims in a similar fashion; and (6) the abuse primarily involved digital penetration. Given how these close similarities between the abuse of the daughters and Stepdaughter demonstrated a common system of abuse repeatedly employed by Petitioner—thus connecting the prior bad acts to the crimes charged—the court of appeals concluded the trial court did not abuse its discretion in admitting the prior bad acts evidence from Stepdaughter. I would affirm that judgment. *Cf., e.g.*, *Hallman*, 298 S.C. at 175, 379 S.E.2d at 117 (holding, in the defendant's trial for the sexual abuse of one foster daughter, that testimony of three other foster daughters' sexual abuse at the hands of the defendant was admissible as demonstrative of a common scheme or plan due to the victims' similar relationship with the defendant, similar ages, and similar stories regarding the commencement of abuse)); *State v. Rainey*, 175 A.3d 1169, 1182–83 (R.I. 2018) (considering a list of factors virtually identical to those enumerated in *Wallace* and concluding those factors established a common scheme or plan to molest, "for all intents and purposes, daughters in [the defendant's] life"); *see also State v. Register*, 698 S.E.2d 464, 466, 470–73 (N.C. Ct. App. 2010) (finding evidence of the defendant's prior sexual abuse of children fourteen, twenty-one, and twenty-seven years before his abuse of the child for whom he was currently on trial was admissible as "a traditional example of a common plan" because the "evidence tended to show that defendant had engaged in strikingly similar

conduct whenever he had access to young relatives of a wife," and the significant gap in time between the victims' abuse "was the result of [the] defendant's not having access to children related to his wife" who were also within his preferred age range).

## III.

The majority portrays *Wallace* as an outlier, as if it stands alone as some distant aberration in the wilderness of South Carolina law. I respectfully disagree.

## A.

*Wallace*'s focus on similarities has been a central feature of our approach to Rule 404(b). When the focus on similarities is viewed as the courts' effort to find a connection between the prior bad acts and the charged crime, I believe the common scheme or plan exception framework is complete. *See, e.g.*, *Whitener*, 228 S.C. at 265, 89 S.E.2d at 711 (stating evidence of other sex crimes may be admissible to establish a common scheme or plan when they "tend[] to show continued illicit intercourse between the same parties"); *State v. Rivers*, 273 S.C. 75, 78–79, 254 S.E.2d 299, 301 (1979) (agreeing with the defendant's argument that the prior bad acts testimony bore "insufficient similarity to the acts allegedly performed on the prosecutrix"; "The only common elements in these described activities appear to be sexual frustration and violence. . . . [T]he dissimilarity which we have above found[] nullifies the probative value of the testimony for [purposes of showing a common scheme or plan]."); *State v. Stokes*, 279 S.C. 191, 192–93, 304 S.E.2d 814, 814–15 (1983) (concluding there was no connection between the defendant's sexual assault of the prosecuting victim and the non-prosecuting victim, and therefore finding the non-prosecuting witness's testimony inadmissible because it did not demonstrate a common scheme or plan); *McClellan*, 283 S.C. at 392, 323 S.E.2d at 774 (holding evidence of prior bad acts were admissible when "the close similarity of the charged offense and the previous acts enhances the probative value of the evidence so as to overrule the prejudicial effect" resulting from the possibility the jury will use the prior bad acts as propensity evidence, and determining the facts alleged by the

prosecuting and non-prosecuting witnesses were so similar to one another that "[i]t would be difficult to conceive of a common scheme or plan more within the plain meaning of the exception than that presented by this evidence" (internal alteration mark omitted) (quoting *Rivers*, 273 S.C. at 78, 254 S.E.2d at 300)); *Hallman*, 298 S.C. at 175, 379 S.E.2d at 117 (finding admissible a pattern of abuse involving the defendant's sexual abuse of his foster daughters, even though some of the daughters were abused to a greater extent than others and they were all different ages, ranging from four to thirteen); *Bell*, 302 S.C. at 28–29, 393 S.E.2d at 370 (determining the State established the defendant's common plan to kidnap, rape, and murder "young, blonde girls" because the evidence of his prior bad acts "connected Bell to the commission of the murder . . . by demonstrating the similarities between the [other two] murders"); *Parker*, 315 S.C. at 233–34, 433 S.E.2d at 832–33 (summarizing the evolution of the common scheme or plan exception in South Carolina, and finding the prior bad acts evidence there exhibited only a "general similarity" to the charged offense and was therefore improperly admitted); *State v. Jenkins*, 322 S.C. 414, 416, 472 S.E.2d 251, 252 (1996) ("In the case of the common scheme or plan exception, there must be *a close degree of similarity or a connection* between the other crimes/bad acts and the crime charged which enhances the probative value of the evidence so as to outweigh the prejudicial effect."; and explaining that "nothing was introduced to show any similarity between these previous [crimes] and the [crime] for which petitioner was on trial," so the testimony regarding the prior bad acts was inadmissible (emphasis added) (citing, *inter alia*, *Parker*, 315 S.C. at 230, 433 S.E.2d at 831; *Bell*, 302 S.C. at 18, 393 S.E.2d at 364; *Hallman*, 298 S.C. at 172, 379 S.E.2d at 115; *McClellan*, 283 S.C. at 389, 323 S.E.2d at 772)); *State v. Wingo*, 304 S.C. 173, 176, 403 S.E.2d 322, 324 (Ct. App. 1991) (holding admissible, as evidence of a common scheme or plan, testimony the defendant had sexually abused the victim's sister in a virtually identical manner to the victim); *State v. Blanton*, 316 S.C. 31, 33, 446 S.E.2d 438, 439 (Ct. App. 1994) (affirming the trial court's decision to admit testimony of two witnesses who were sexually abused by the defendant seven to eight years before the victim because each of the victims was about the same age when the abuse occurred, each was subject to similar abuse, each act took place in the defendant's house or vehicle, and in each instance,

the defendant took advantage of his relationship with the victim for his sexual gratification), *cert. denied*, Mar. 9, 1995; *State v. Adams*, 332 S.C. 139, 143, 504 S.E.2d 124, 126 (Ct. App. 1998) (upholding the trial court's admission of the defendant's stepdaughter's testimony of eight years of extensive, uncharged sexual abuse in part because it mirrored the charged allegations made by another stepdaughter); *State v. Atieh*, 397 S.C. 641, 648, 725 S.E.2d 730, 734 (Ct. App. 2012) (determining the trial court properly admitted testimony that another victim was abused under a common scheme or plan, in part because the "similarities of both women's testimonies far outweigh[ed] the differences"), *cert. denied*, Aug. 21, 2014; *State v. Beekman*, 405 S.C. 225, 232, 746 S.E.2d 483, 487 (Ct. App. 2013) (concluding joinder of sexual abuse charges related to the defendant's stepdaughter and stepson was appropriate in part because "his sexual abuse of each of the stepchildren would have been admissible in separate trials to show a common scheme or plan," and the evidence tended to show the defendant had a common plan to sexually abuse his prepubescent stepchildren while in their family home), *aff'd*, 415 S.C. 632, 785 S.E.2d 202 (2018); *State v. Scott*, 405 S.C. 489, 501–03, 748 S.E.2d 236, 243–44 (Ct. App. 2013) (affirming the trial court's admission of testimony related to the defendant's prior uncharged sexual abuse of two minors as indicative of a common scheme or plan due to peculiar similarities between those allegations and the charged offense), *cert. dismissed as improvidently granted*, 413 S.C. 24, 773 S.E.2d 912 (2015).[20]

As this extensive list of cases makes clear, *Wallace* is not the outlier portrayed by the majority.  Notably, the cases cited above both pre- and post-date this Court's decision in *Wallace*, thus proving my point that *Wallace* was not an aberration, save the rejection of the connection test.  Nevertheless, as the cases demonstrate, the phrase "similarities" became what I view as a shorthand description to embrace the convergence of similarity and connection.  *Wallace* erred in expressly disavowing the connection test.

---

[20] Although the Bluebook ordinarily requires the listing of cases in reverse chronological order, I have purposefully listed the cases above from oldest to newest in an effort to demonstrate *Wallace* did not represent a sea change in our case law, as the majority contends.

If the majority simply modified (or even overruled) *Wallace* and reinstated the longstanding framework of a connection between the prior bad acts and the charged crime, I would join the Court to that extent. Yet I am firmly persuaded the Rule 404(b) evidence in Petitioner's case satisfies the connection test.

**B.**

It is also important to note that South Carolina's longstanding approach to Rule 404(b) is in line with the law in other jurisdictions. Although my research is not exhaustive, most jurisdictions allow prior bad acts evidence in criminal sexual conduct cases. *See generally, e.g.*, *Elliott v. State*, 600 P.2d 1044, 1047–48 (Wyo. 1979) ("Our analysis of cases from other jurisdictions leads to the conclusion that in recent years a preponderance of the courts have sustained the admissibility of the testimony of third persons as to prior or subsequent similar crimes, wrongs or acts in cases involving sexual offenses. Among the grounds relied upon for the admissibility of such evidence is that it is admissible to show motive or to show plan, with various phrases being used by the courts to describe those concepts. We note that in cases involving sexual assaults, such as incest, and statutory rape with family members as the victims, the courts in recent years have almost uniformly admitted such testimony." (internal citations omitted) (collecting cases)); *see also Ex parte Register*, 680 So. 2d 225, 227 (Ala. 1994); *Derouen v. State*, 994 So. 2d 748, 753 (Miss. 2008) (noting the "overwhelming weight of authority is that in the unusual context of" child sex abuse cases, evidence of similar sex crimes committed on non-prosecuting minors is admissible (citation omitted) (collecting cases)); 1 Kenneth S. Broun et al., *McCormick on Evidence* § 190 & nn. 66, 67, & 68 (Kenneth S. Broun & Robert P. Mosteller, eds., 7th ed. 2013 & Supp. 2016) (collecting cases); 2 *Wigmore on Evidence* §§ 304 & n.1, 357, 360, 398–402 ("[A] single previous act, even upon another [victim], *may*, with other circumstances, give strong indication of a design (*not a disposition*) to rape . . . . Courts have shown altogether too much hesitation in receiving such evidence.[] Even when rigorously excluded from any bearing it may have upon character, it may carry with it great significance as to a specific design or plan of rape." (second emphasis added) (footnote omitted)) (collecting cases).

## IV.

Even were I to agree with the majority that we should overrule *Wallace* and return to the allegedly halcyon days where *Lyle* alone provided the authoritative 404(b) analysis, the majority's own factual recitation and analysis is incorrect.

## A.

Initially, the majority tells us Stepdaughter's testimony "was clearly relevant [to the State's case *only*] because if [Petitioner] committed similar acts of sexual abuse against a minor in the past, he was more likely to have done it this time too."  However, the majority attributes a position to the State it has never taken, namely that the State offered the evidence to show Petitioner has a propensity to sexually abuse minors.  It is an unfair tactic to attribute a strawman argument to the State and then righteously tear it down.

It appears the majority frames the issue falsely as a fitting segue to its discussion of the evils of propensity evidence.  Of course, if the State had argued Stepdaughter's testimony were relevant and admissible because Petitioner had a propensity to sexually abuse his children, I am confident the experienced trial judge would have summarily disallowed the testimony.  Propensity evidence is forbidden, as the State is well aware.  *See* Rule 404(b), SCRE ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.").

In truth, despite the majority's incorrect portrayal of the State's position, the State has at all times relied on the common scheme or plan exception to Rule 404(b) to support the admission of Stepdaughter's testimony.  Importantly, *there is a rule of evidence that allows this kind of testimony*, not "to prove the character of a person in order to show action in conformity therewith," but to show, for example, a common scheme or plan.

## B.

Following the false premise that the State wanted to admit Stepdaughter's testimony on legally impermissible grounds, the majority opinion lectures on

the evils of propensity evidence. I agree with the majority that propensity evidence is inappropriate for a number of reasons, and I am confident the State readily agrees as well. As I wrote fifteen years ago,

> Perhaps no tenet of evidence law in the context of "prior bad acts" is more firmly established than the principle that propensity or character evidence is inadmissible to prove the specific crime charged. . . . This rule of evidence is universally recognized in American jurisprudence and is necessary to ensure that the presumption of innocence is not relegated to an empty phrase.

*State v. Tuffour*, 364 S.C. 497, 502, 613 S.E.2d 814, 817 (Ct. App. 2005), *vacated by settlement on other grounds*, 371 S.C. 511, 641 S.E.2d 24 (2007) (per curiam). While the majority's lecture on the evils of propensity evidence may make good theater, it does little to answer the question of whether the trial court abused its discretion in admitting Stepdaughter's testimony under the common scheme or plan exception to Rule 404(b).

It is also important to remember the *only* Rule 404(b) evidence admitted and challenged in this appeal was the testimony of *Stepdaughter*. The majority relies heavily on its belief that there are differences in the facts of the sexual abuse of Daughter Two and Daughter Three, which—even if true—is not Rule 404(b) evidence. While I find significant similarities in the abuse of Daughters Two and Three, the presence of any dissimilarities is wholly unrelated to the Rule 404(b) analysis. Petitioner was charged with criminal sexual conduct for his alleged sexual abuse of *both* Daughters Two and Three. In finding the abuse of Daughters Two and Three was significantly dissimilar, the majority is conflating joinder and Rule 404(b) prior bad acts evidence, with no citation to authority from this jurisdiction or any other to support its analysis.[21] Any dissimilarity between the abuse of Daughters Two

---

[21] Petitioner's indictments for the alleged sexual abuse of Daughters Two and Three were consolidated into a single trial. At no point has Petitioner ever contended the joinder of those indictments was improper or that the trial court erred in failing to sever the charges. *Cf. Cope*, 405 S.C. at 334–39, 340–41, 748 S.E.2d 203–05, 206 (analyzing separately, as alternative grounds for reversal, the defendant's

and Three is irrelevant to the Rule 404(b) discussion.  The only relevant comparison for Rule 404(b) purposes is the similarities or dissimilarities of the sexual abuse of Stepdaughter compared to the sexual abuse of Daughters Two and Three, as that would connect Petitioner's abuse of Stepdaughter with his abuse of his two daughters.

**C.**

I additionally take exception to the majority's attempt to create dissimilarities where the similarities between the victims' abuse and the abuse of Stepdaughter are obvious and striking.  As noted above and accurately presented by the court of appeals, all victims were of a similar age when the abuse began and ended; a parent-child relationship existed between Petitioner and all of the victims; the victims were molested in Petitioner's residence; the abuse typically occurred in the victims' bedrooms; Petitioner threatened all of the victims in a similar fashion; and the abuse primarily involved digital vaginal penetration.  This evidence established the connection historically required in our Rule 404(b) jurisprudence.[22]

---

contentions that prior bad acts evidence was improperly omitted for purposes of Rule 404(b) and as grounds to deny his motion to sever).

[22] Other state courts have found the concurrence of similar factors equally compelling in holding testimony regarding a defendant's prior bad acts was admissible pursuant to Rule 404(b).  *See, e.g.*, *People v. Sabin*, 614 N.W.2d 888, 901 & n.11 (Mich. 2000) ("The charged and uncharged acts contained common features beyond mere commission of acts of sexual abuse.  Defendant and the alleged victims had a father-daughter relationship.  The victims were of similar age at the time of the abuse.  Defendant allegedly played on his daughters' fear of breaking up the family to silence them.  One could infer from these common features that defendant had a system that involved taking advantage of the parent-child relationship, particularly his control over his daughters, to perpetrate/abuse.  That these facts also prove the elements of a[n uncharged] criminal offense is not pertinent to our inquiry.  The question is whether the circumstances surrounding the charged and other acts support an inference of a common system[, and we find they do].");  *Register*, 698 S.E.2d at 472–73 ("We hold that th[e challenged testimony regarding the defendant's prior bad acts was admissible].  The

The majority finds these similarities—and the resultant connection—meaningless.[23]  For example, we learn the fact that all of the abuse "occurred

_____

challenged testimony showed a strikingly similar pattern of sexually abusive behavior by defendant over a period of 31 years: (1) defendant was married to each of the witnesses' mothers or aunt, (2) the sexual abuse occurred when the children were prepubescent, (3) at the time of the abuse, defendant's wife was away at work while he was home looking after the children, and (4) the abuse involved fondling, fellatio, or cunnilingus, in most instances taking place in defendant's wife's bed. This evidence presents a traditional example of a common plan.  While there was a significant gap of time between [some of the four victims' tales of] abuse, that gap was the result of defendant's not having access to children related to his wife."); *Rainey*, 175 A.3d at 1183–85 (finding, in the defendant's trial for the sexual abuse of a minor, the defendant's daughter's testimony "fit[] comfortably within a Rule 404(b) exception to show [a] plan to abuse young girls of a similar age with whom he had a similar relationship," and explaining:  "To start, each of defendant's indiscretions were directed against, for all intents and purposes, daughters in his life:  in Anna's case, the daughter of a girlfriend who called him 'Dad,' and in Beth's case, his biological daughter.  Each victim was around eight years old when the abuse first occurred, and away from their mother's supervision.  Although the exact locations differed, the majority of the abuse occurred in what was at the time defendant's residence, where he had direct access to the victims:  in Anna's case, the home he shared with her mother (with only two exceptions), and with Beth, an apartment in which he lived alone.  Moreover, the manner of abuse was similar with each victim in that both cases involved penetration, successful or otherwise."); *see also Flanery v. State*, 208 S.W.3d 187, 190 (Ark. 2005) ("Here, though the specific acts complained of are not identical, the victim and the witness were similar in age when the abuse happened. Further, both girls were living in the home of the appellant and looked on him as a father figure at the time of the abuse. In each case, the appellant attempted to rationalize his behavior in some way. Moreover, both girls testified to inappropriate touching of the vaginal area. In light of the similarities in age and presence of the victims in the same household, we hold that the circuit court did not abuse its discretion in allowing [the witness's] testimony.").

[23] In fact, the majority opines that "a very high percentage of sexual crimes against children are committed just like [Petitioner's] alleged crimes:  by father figures, in the home, in a bedroom, beginning in the pre-pubescent years."  However, in listing what it views as these "general" factors, the majority omits one of the most

within [Petitioner's] home" means nothing, for it is "too general to be considered a meaningful similarity."  I disagree, and this Court's precedent agrees with me.  *See, e.g.*, *State v. Cutro*, 365 S.C. 366, 376, 618 S.E.2d 890, 895 (2005) (finding three instances of Shaken Baby Syndrome occurring in the defendant's home daycare were "similar in kind, *place*, and character" and therefore "clearly fit within the *Lyle* categories for common scheme or plan" (emphasis added)); *Hallman*, 298 S.C. at 175, 379 S.E.2d at 117 (holding the defendant's sexual abuse of four unrelated foster daughters demonstrated a common scheme or plan when the abuse of each girl occurred generally on the defendant's property, despite the fact that some of the victims were only abused indoors (in the bedroom and bathroom), while others were primarily abused outside (in the barn, on the tractor, or while riding a pony)).[24]  Such a

---

significant distinguishing factors:  the type of sex act inflicted on the child victim.  In many child sex abuse cases, the perpetrator commits the same, or highly similar, sex acts on the victim(s), thus establishing he has a common system of abuse that he repeatedly implements.  Of the enumerable sex acts Petitioner could have inflicted on his daughters, he primarily chose digital vaginal penetration.  I find this significant because *it demonstrates the connection between the allegations of abuse*.  Petitioner did not rape the girls, nor did he generally choose to perform oral sex on them, nor did he abuse them in a manner requiring their active participation (such as forcing them to touch him in some manner); rather, he ordinarily committed the exact same sex act in the same manner in the same location while the girls were around the same age, threatening them similarly in order to ensure their silence.  The majority overlooks the nearly-exclusive type of abuse inflicted on the girls.

[24] Additionally, in its rush to point out every possible dissimilarity between the victims' versions of events, the majority falsely claims Petitioner threatened Stepdaughter but not Daughters Two and Three.  A review of the record proves this is incorrect, as Petitioner threatened all three victims.  In a similar vein, the majority finds dissimilarities in the facts that the defendant abused (1) Daughter Two for the first time in front of the television, but Daughter Three and Stepdaughter for the first time in their bedrooms; and (2) Stepdaughter in the bathtub one time, whereas Daughters Two and Three were never abused in the bathroom.  The majority is determined to try to split hairs in making such a fine distinction, as the television and bathtub abuse sites were, by all accounts, singular

finding amounts to the majority making its own findings of fact and ignoring our settled approach to reviewing these types of trial court determinations under an abuse of discretion standard.

Likewise, in its pursuit to show dissimilarities, the majority implies there was a large gap in the age of onset of abuse among the children. When the age ranges (regarding onset of abuse) of Daughters Two and Three are properly stated, it is easy to understand why the trial court found a sufficient age-similarity between the two daughters and Stepdaughter. The record shows Daughter Two was between the ages five and seven when Petitioner began sexually abusing her. Similarly, the record reflects Daughter Three's age at the onset of abuse was about ten or eleven years old. Stepdaughter was nine years old when Petitioner began abusing her.[25]

Notably, the most dissimilar ages of the three victims were between Daughters Two and Three (five to seven vs. ten or eleven years old), *not* Daughter Two and Stepdaughter (five to seven vs. nine years old) *or* Daughter Three and Stepdaughter (ten or eleven vs. nine years old). Thus, the majority's statement reflects a mischaracterization of the evidence and a misunderstanding of the issue on appeal by analyzing what it believes are dissimilarities involving the crimes against *Daughters Two and Three*, for which Petitioner was on trial. However, again, Petitioner never challenged being jointly tried for the alleged sexual abuse of Daughters Two and Three, and, therefore, any dissimilarity in ages between Daughters Two and Three is not properly before this Court. Rather, the only Rule 404(b) evidence was the testimony of Stepdaughter. Viewed properly, Stepdaughter's abuse onset at age nine may be characterized as similar to ages "five to seven" (Daughter Two) and "about ten or eleven years of age" (Daughter Three).

I understand why the majority is bent on calling similarities dissimilarities, but it is troubling that the majority contends that the ages of onset of abuse for the three victims were grossly dissimilar. Plainly stated, the three victims testified the abuse could have started as close together as ages seven, nine,

occurrences given that all three victims were almost exclusively abused in their bedrooms.

[25] Moreover, the victims' ages when the abuse ended were similar: fifteen years old for Daughter Two, eleven years old for Daughter Three, and fourteen years old for Stepdaughter.

and ten.  I cannot fathom how the majority has found the ages of the victims are so divergent as to remove them from a common scheme or plan to abuse young girls.  While the majority acknowledges the obvious—that age nine is similar to age ten—it then concludes that ages nine and seven are not similar.  I could not more strongly disagree, particularly when it appears the Court has chosen to establish this fact as a matter of law and not based on the characteristics of the children in this particular case.  Regardless, even if I were to accept the majority's effort to peg the age of onset for Daughters Two and Three as far away as possible from Stepdaughter (at five, nine, and eleven years old), I would nevertheless find there is sufficient similarity in the ages of the victims such that this Court cannot properly find an abuse of discretion in the decision of the trial court, as the standard of review requires.  *See Hallman*, 298 S.C. at 174–75, 379 S.E.2d at 117 (finding victims aged four to seven when the abuse began—and four to thirteen when the abuse ended—were similar enough in age to admit prior bad acts testimony).[26]

---

[26] I have cited to *Hallman* extensively throughout my dissent because it predates *Wallace* and yet relies on a somewhat similar analysis to reach the same result.  I find it telling the majority has not cited to or made any attempt to distinguish *Hallman*.  In my opinion, *Hallman* is perhaps the most factually similar case to the present as it also involves victims of differing ages who occupied a similar relationship to the defendant and were abused in somewhat similar (but not identical) manners and in somewhat similar (but not identical) locations.   I believe *Hallman* provides valuable insight into the *Wallace* factors, and specifically how those factors are guideposts for courts to analyze whether the similarities between the charged crime and any prior bad acts establish the requisite connection so as to show the defendant's common criminal system.  *See Bell*, 302 S.C. at 28–29, 393 S.E.2d at 370; *Tutton*, 354 S.C. at 328, 580 S.E.2d 191; 2 *Wigmore on Evidence* § 304.  Unable to distinguish *Hallman*, the majority's only recourse is to overrule it.  Yet the majority insists that *Wallace* is some rogue, isolated decision in our Rule 404(b) jurisprudence.  The majority cannot have it both ways.  *Hallman* is perhaps the clearest demonstration in South Carolina's case law that *Wallace* did not create a new rule of evidence but, rather, is in line with this Court's longstanding interpretation of Rule 404(b) and *Lyle* in the specific context of sexual assault cases.  *Cf. Parker*, 315 S.C. at 233, 433 S.E.2d at 832 ("The analysis adopted in *Hallman* was a clarification of the *McClellan* [] test.").  The court of appeals'

## D.

There are evidentiary challenges peculiar to criminal sexual conduct cases that have been recognized by our legislature and the Rules of Evidence. Specifically, our legislature has recognized the difficulty of prosecuting sexual assault cases, providing as a matter of substantive law that the testimony of a criminal sexual conduct victim need not be corroborated. *See* S.C. Code Ann. § 16-3-657 (2015). This same targeted treatment of criminal sexual conduct cases is found in the Rules of Evidence, specifically Rule 801(d)(1)(D), which characterizes as nonhearsay (and, thus, admissible) a statement "consistent with the declarant's testimony in a criminal sexual conduct case or attempted criminal sexual conduct case where the declarant is the alleged victim and the statement is limited to the time and place of the incident."[27] There are no other crimes where the legislature has similarly spoken by providing such specific rules, substantive and procedural. I believe the reason is obvious—criminal sexual conduct crimes are typically done under the cover of darkness with no witnesses present other than the alleged perpetrator and alleged victim, often causing the case to devolve into a "he said/she said" battle of credibility. Significantly, these criminal sexual conduct considerations apply while holding the State to its burden of proof, in

---

decisions in *Wingo*, *Blanton*, and *Adams*—all of which predate *Wallace*—are much in the same vein.

[27] Similarly, Rule 412, SCRE, limits the admissibility of evidence related to the victim's sexual conduct with persons other than the defendant. *See also* S.C. Code Ann. § 16-3-659.1 (2015) (providing, *inter alia*, "Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct is not admissible in prosecutions" for criminal sexual conduct or spousal sexual battery, but if a defendant seeks to introduce the evidence for one of the few, specifically-listed purposes other than tarnishing the victim's reputation, "the defendant, prior to presenting his defense[,] shall file a written motion and offer of proof," and the court must conduct an *in camera* hearing to determine if the evidence satisfies one of the limited exceptions).

that they apply while maintaining the presumption of innocence and the panoply of rights to ensure a fair trial to an accused.

A number of our cases illustrate that the challenges inherent in sexual assault cases become heightened when the alleged victim is a child. For example, child sexual abuse cases commonly involve grooming, secrecy, delayed disclosure, and threats of reprisal.[28] A child witness is unlike an adult witness even under ordinary circumstances. However, this distinction is particularly evident in a sexual abuse situation. In child molestation cases, it is not reasonable to call an alleged child sexual abuse victim a "witness" in the ordinary sense, for a child victim of tender years often fails or—at best—struggles to comprehend the criminality of the abuse. As a result, children

---

[28] *See, e.g.*, Colo. Rev. Stat. § 16-10-301(1) (2019) ("[Sex] offenses often are not reported or are reported long after the offense for many reasons, including: The frequency with which the victims are vulnerable, such as young children who may be related to the perpetrator; the personal indignity, humiliation, and embarrassment involved in the offenses themselves; and the fear of further personal indignity, humiliation, and embarrassment in connection with investigation and prosecution. These offenses usually occur under circumstances in which there are no witnesses except for the accused and the victim, and, because of this and the frequent delays in reporting, there is often no evidence except for the conflicting testimony. Moreover, there is frequently a reluctance on the part of others to believe that the offenses occurred because of the inequality between the victim and the perpetrator, such as between the child victim and the adult accused, or because of the deviant and distasteful nature of the charges."); *People v. Watkins*, 818 N.W.2d 296, 310 (Mich. 2012) ("Evidence of guilt in child molestation cases is typically hard to come by because in most cases the only witness is the victim, whose testimony may not be available, helpful, or deemed credible because of his or her age. It may also be difficult for a jury to believe that a defendant is capable of engaging in such egregious behavior with a child."); *Derouen*, 994 So. 2d at 754–55 ("Sex crimes against children are furtive, secret events usually lacking evidence other than the conflicting testimony of the defendant and the victim. The only viable proof of motive, intent, plan, knowledge, identity or absence of mistake or accident may be the pattern of abuse suffered by others at the hands of the defendant. The need for this type of evidence has influenced the law in several states." (internal quotation marks omitted)).

who have been sexually abused often are unable to pinpoint the exact date, or even year, of their abuse.  The lack of precision in setting the exact date when the child sexual abuse began is understandable, given the fragility and tender years of such victims.  As occurred in this case, the inability to determine with certainty the precise age of onset of abuse for a child victim is merely another illustration of the evidentiary challenges child sexual abuse cases present.  Nonetheless, in its rush to overrule *Wallace*, the majority ignores the deferential abuse of discretion standard of review, giving no quarter to the three victims, nitpicking any perceived dissimilarities in their testimony, and creating distinctions in their stories of abuse when, in fact, there are very few.

## V.

The majority relies on *Lyle* to support its rewriting of the common scheme or plan exception to Rule 404(b).  I have long thought that *Lyle* has been wrongly cited as the gold standard for common scheme or plan evidence.  I have decided this case is the proper occasion to set forth my view of *Lyle*'s appropriate place in Rule 404(b) common scheme or plan jurisprudence.

## A.

In *Lyle*, the defendant was charged with a forgery committed in Aiken in which he allegedly entered a bank, presented and cashed a forged check under a pseudonym, and disappeared before the forgery could be discovered.  125 S.C. at 412–13, 118 S.E. at 805–06.  With the trial court's permission, the State introduced evidence of five other forgeries conducted in similar manners, two of which were committed in Aiken the morning of the charged offense, and three of which were committed in Georgia in the weeks leading up to the charged offense.  *Id.* at 413–14, 118 S.E. at 806.  The defendant claimed he had an alibi.  *Id.* at 411, 118 S.E. at 805.  Nonetheless, the jury convicted the defendant of the charged forgery, and the defendant appealed.

In addressing the five uncharged forgeries, the Court cautioned against the use of propensity evidence, explaining it "predispose[d] the mind of the juror to believe the prisoner guilty, and thus effectually [] strip[ped] him of the presumption of innocence." *Id.* at 416, 118 at 807.  Nonetheless, the Court recognized there were five well-established exceptions to the general ban on

such evidence, including motive, intent, "a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others," and identity. *Id.* (quoting *People v. Molineux*, 61 N.E. 286, 294 (N.Y. 1901)). The Court continued:

> Whether evidence of other distinct crimes properly falls within any of the recognized exceptions noted is often a difficult matter to determine. The acid test is its logical relevancy to the particular excepted purpose or purposes for which it is sought to be introduced. If it is logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime. . . . [I]f the court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt, and the evidence should be rejected.

*Id.* at 416–17, 118 S.E. at 807. The Court then proceeded to address the three exceptions the State contended rendered all five forgeries admissible: identity, intent, and common scheme or plan. *Id.* at 417, 118 S.E. at 807.

Looking first at identity, the Court engaged in a lengthy discussion of how the two Aiken forgeries were more probative of identity than the three Georgia forgeries. In particular, the Court held the forgeries that occurred in Aiken were properly admissible because the evidence "tend[ed] to locate the accused in the immediate vicinity of the crime at the time of its commission, to refute the defense of alibi, and thus to identify defendant as the perpetrator of the crime." *Id.* at 417–18, 118 S.E. at 807 (describing those forgeries as "similar transaction[s]," and determining the State had established the identity exception for the uncharged Aiken forgeries because (1) the eyewitnesses from all three Aiken banks identified the defendant as the perpetrator; (2) the defendant used the same R.F.D. address for two of the three forged checks; and (3) there was a "marked similarity in technique of operation"). The Court found the testimony regarding the three Aiken forgeries essentially established the *res gestae* of the charged crime, in that it inferred "the two

extraneous crimes were committed within a few town blocks as to distance, and within a few minutes, as to time, of the crime charged, . . . each a part of one general scheme of a single expedition." *Id.* at 418, 118 S.E. at 808. Accordingly, the Court concluded, "The connection for the purpose of establishing the identity of the accused under the issue raised as to the alibi we think is clear." *Id.*

In contrast, the Court found the Georgia forgeries committed in the weeks before the charged crime, although being similar transactions, were inadmissible because "[t]here [wa]s no connection of time and place" and therefore "d[id] not serve to identify the defendant as the person who uttered the forged check in [the charged offense], unless his guilt of the latter crime may be inferred from its similarity to the former." *Id.* at 420, 118 S.E. at 808. As to the Georgia forgeries, the Court explained:

> To warrant such inference [regarding the perpetrator's *identity*,] the similarity must have established such a connection between the crimes as would logically exclude or tend to exclude the possibility that the [charged] Aiken crime could have been committed by another person. There is nothing to indicate that the defendant held any monopoly on the methods and means used in passing the forged checks in Georgia, or that they were unique in the annals of crime. That the [charged] Aiken crime could have been committed by one of innumerable other persons using like means and methods is obvious.

*Id.* at 420–21, 118 S.E. at 808 (internal citation omitted). Thus, the Court found, "That there was no [] obvious connection between the Georgia crimes and the offense charged in this case we think is clear." *Id.* at 422, 118 S.E. at 809.

Moving on to the State's third proposed ground for admissibility—a common scheme or plan to execute all five forgeries—the Court's discussion became

cursory, at best, discussing the entire topic in a single, short paragraph.[29]  *Id.* at 427, 118 S.E. at 811.  The Court explained a common scheme or plan was immaterial to the case *except as it related to identity or intent*.  *Id.*  Because the Court found the Georgia forgeries were not part of the *res gestae* of the charged crime and did not establish identity (or intent), the Court concluded they were inadmissible to show a common scheme or plan as well.  *Id.*

**B.**

*Lyle* observed that "the relevancy of the testimony [of the uncharged Aiken forgeries] to the vital issue made [wa]s . . . obvious":  the Aiken forgeries disproved the defendant's alibi defense and corroborated other witnesses' testimony identifying him as the perpetrator.  *Id.* at 418, 118 S.E. at 807.  Thus, *Lyle* is primarily an identity case, not a common scheme or plan case.[30]  Nevertheless, to the extent *Lyle* is the leading authoritative precedent in our state as to the common scheme or plan exception, *Lyle* specifically recognizes that the methods involved in the unindicted forgeries were *not* "unique in the annals of crime," and could have been executed by any number of people.  *Id.* at 420–21, 118 S.E. at 808.  Even the other Aiken forgeries, which were properly admitted, were not unique.

One can conclude the methodology used in *Lyle* was not particularly distinctive, given that the same crimes were repeated in Georgia and South Carolina.  Instead, in the context of the defendant's alibi defense, it was the convergence of similar methodology combined with closeness of time and place that rendered the Aiken forgeries admissible *under the identity exception*.  The lack of closeness of time and place rendered the Georgia forgeries inadmissible under the identity exception because, as explained by

---

[29] In contrast to the cursory discussion of the common scheme or plan exception, the Court's discussion of identity covered eight pages, and the Court's discussion of intent covered four pages.

[30] Of course, here, we have the exact opposite factual scenario as *Lyle*, where the identity of the alleged perpetrator is known, and the question is whether he actually committed the offenses of which he has been accused.  As I will discuss later, this factual scenario does not invoke the identity exception, as *Lyle* did, but instead the common scheme or plan exception.

the Court, it "doubtless could have been shown[] that many similar crimes had been committed by others in practically the same manner and by the same methods." *Id.* at 421, 118 S.E. at 808.

I fail to see how the majority's apparent reliance on uniqueness, rather than a high degree of similarity, remedies its criticism of *common* scheme or plan evidence. The majority is missing an inferential step—one that is satisfied through either a repeated pattern of highly similar *or* unique criminal activity—that being "where there is a pattern of continuous conduct shown, that pattern clearly supports the inference of the existence of a common scheme or plan, thus bolstering the probability that the charged act occurred in a similar fashion." *Tutton*, 354 S.C. at 328, 580 S.E.2d at 191. To the extent the majority opinion may be construed to require some uniqueness in the defendant's criminal process that connects the prior bad acts to the crime charged, I respectfully disagree.[31]

Rather, as I will discuss further, the convergence of a large number of similarities between crimes can also properly establish a common scheme or plan, just as occurred in *Wallace*, *Hallman*, and many other cases.

## C.

As noted, *Lyle* is an identity case with only a passing reference to the common scheme or plan exception, given its cursory treatment of the topic.

---

[31] *Cf. Shapiro v. State*, 696 So. 2d 1321, 1324 (Fla. Dist. Ct. App. 1997) ("Similar fact evidence of collateral crimes may be admitted as relevant even if it is not uniquely similar."); *Sabin*, 614 N.W.2d at 900 ("[T]he necessary degree of similarity [to establish a common scheme or plan under Rule 404(b)] is greater than that needed to prove intent, but less than that needed to prove identity. To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of spontaneous acts, but *the plan thus revealed need not be distinctive or unusual*." (emphasis added) (citation omitted) (internal quotation marks omitted)); *State v. Gresham*, 269 P.3d 207, 214 (Wash. 2012) (en banc) ("[T]he relevant commonality [to establish a common scheme or plan] need not be a unique method of committing the crime." (internal quotation marks omitted) (citation omitted)).

As a result, I turn to other jurisdictions for a meaningful understanding and a fuller discussion of the common scheme or plan exception.[32]

It is widely agreed that

> To bring a case within this exception to the general rule which excludes proof of extraneous crimes, there must be evidence of [a] system between the offense on trial and the one sought to be introduced. *They must be connected as parts of a general and composite plan or scheme, or they must be so related to each other as to show a common motive or intent running through both*.

*Molineux*, 61 N.E. at 299 (emphasis added) (quoting multiple sources as standing for the proposition that "a connection between the[ charged and uncharged crimes] must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish" (citations omitted)); *Bracey v. United States*, 142 F.2d 85, 88 (D.C. Cir. 1944) (describing the common scheme or plan exception, in part, as allowing evidence of prior crimes when the charged and uncharged crimes "are connected with a single purpose and in pursuance of a single object"). Generally, common scheme or plan cases take one of three forms, only one of which applies in the case before us. I will briefly mention the other types of cases for context.

In the first type of case—perhaps the easiest to determine and distinguish— the charged and uncharged crimes need not be similar at all, but instead are connected because they form the *res gestae* of the charged crime. *See, e.g.*, *Gresham*, 269 P.3d at 214 (describing the *res gestae* exception as when "several crimes constitute constituent parts of a plan in which each crime is but a piece of the larger plan" (citation omitted)); *see also State v. Curry*, 330 N.E.2d 720, 725 (Ohio 1975) (explaining the *res gestae* exception is necessary because "it would be virtually impossible to prove that the accused committed the crime charged without also introducing evidence of the other

---

[32] There is no suggestion by the majority that the subsequent discussion synthesizing law from other jurisdictions is somehow contrary to South Carolina law.

acts"); *State v. McIntyre*, 861 A.2d 767, 769–70 (N.H. 2004) (stating that in the case of the *res gestae* exception, the charged and uncharged acts are mutually dependent on one another; however, a calculated progression of sexual abuse, such as grooming, can also satisfy the *res gestae* exception). This exception clearly is not applicable here because Petitioner's abuse of Daughters Two and Three did not hinge on his successful abuse of Stepdaughter.

The second and third types of cases have overlapping features but remain distinct. *See People v. Ewoldt*, 867 P.2d 757, 764 n.2 (Cal. 1994) (in bank) (describing the distinction as "subtle but significant"), *superseded by statute on other grounds by* Cal. Evid. Code § 1108 (West 2019) (adopting a rule similar to that found in Rules 413 and 414 of the Federal Rules of Evidence). In the second type of case, the common scheme or plan exception is entwined with the identity exception: the logical connection between the charged and uncharged crimes stems from a sufficient degree of similarity between the crimes to support an inference that they are manifestations of a common scheme or plan such that "he who committed the one must have done the other." *See Lyle*, 125 S.C. at 420–22, 118 S.E. at 808–09 (citation omitted); *Molineux*, 61 N.E. at 300 (citation omitted). Some courts refer to this as the *modus operandi* exception because the acts tend to be either distinctive (i.e., exhibit a high degree of similarity) *or* closely connected in time or place, either of which render it highly improbable they would have been committed by another. *See, e.g.*, *Lyle*, 125 S.C. at 420–21, 118 S.E. at 808; *Montgomery v. Commonwealth*, 320 S.W.3d 28, 34 (Ky. 2010); 2 *Wigmore on Evidence* §§ 304 & n.1, 306 & n.2, 416 & n.1. Notably, this exception is only available when identity is an issue in the case. *Lannan v. State*, 600 N.E.2d 1334, 1340 (Ind. 1992); *see also Ewoldt*, 867 P.2d at 764 n.2 (explaining identity is in issue when "it is conceded or assumed that the charged offense was committed by someone" but the perpetrator is unknown and the accused denies he committed the crime). Where, as here, the question is whether the

sexual abuse occurred at all, and not who the perpetrator was, the identity exception does not apply.[33]

The third type of case is the one the majority arguably diminishes, yet it is just as well-established as the first two types of cases. *See, e.g.*, *Tutton*, 354 S.C. at 325–31, 580 S.E.2d at 189–93 (explaining the third exception in great detail (citing, *inter alia*, *Sabin*, 614 N.W.2d at 900 & n.10;[34] 2 *Wigmore on Evidence* § 304)). In the third type of case, "an individual devises a plan and uses it repeatedly to perpetrate separate but very similar crimes." *Gresham*, 269 P.3d at 214 (citation omitted); *see also Sabin*, 614 N.W.2d at 899. As the Supreme Court of Washington explained:

> Evidence of this [] type of common scheme or plan is admissible because it is not an effort to prove the character of the defendant. Instead, it is offered to show that the defendant has developed a plan and has again put that particular plan into action. In order to introduce evidence of th[is] type of common scheme or plan, the prior misconduct and the charged crime must demonstrate such occurrence of common features that the various acts are naturally to be explained as caused by a general plan of which the two are simply individual manifestations.

---

[33] Because identity is not at issue here, I would find *Lyle* inapplicable as well, despite the majority's dogged reliance on its analysis.

[34] I agree with *Tutton*'s reliance on the Supreme Court of Michigan's decision in *Sabin*. Among other reasons I find *Sabin* persuasive authority, Michigan—like South Carolina, and unlike several other states—has never adopted a "lustful disposition"/"depraved sexual instinct" exception to Rule 404(b). *Compare State v. Nelson*, 331 S.C. 1, 14 n.16, 501 S.E.2d 716, 723 n.16 (1998) ("South Carolina has not recognized [a "lustful disposition"] exception, nor are we inclined to do so."), *with Sabin*, 614 N.W.2d at 898 & n.7 (making a similar observation about the state of Michigan law).

*Gresham*, 269 P.3d at 214 (internal citation omitted) (internal quotation marks omitted);[35] *accord Tutton*, 354 S.C. at 325–31, 580 S.E.2d at 189–93.

As explained by Professor Wigmore, and quoted with approval by the court of appeals in *Tutton*,

> [T]he effort is to establish a definite prior design or system which included the doing of the act charged as part of its consummation. . . . [T]he result is to show (by probability) a precedent design which in its turn is to evidence (by probability) the doing of the act designed.
>
> The added element, then, must be[] not merely a similarity in the results, but *such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.*

2 *Wigmore on Evidence* § 304. Moreover, and contrary to the majority,

> [E]vidence of similar misconduct is logically relevant [not to show propensity, but] *to show that the charged act occurred [at all]* where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system.
>
> . . . The jury is not required to draw an inference regarding the defendant's character. Rather, the jury is asked to infer the existence of a common system and consider evidence that the defendant used that system in committing the charged act as proof that the charged act occurred. The logical relevance of the evidence is based on the system, as shown through the similarities between the charged and uncharged acts, rather than on [the] defendant's character, as shown by the uncharged act.

---

[35] The state of Washington's version of Rule 404(b)—much like South Carolina's—is a rule of exclusion, not inclusion. *See Gresham*, 269 P.3d at 213–14 (stating evidence of prior bad acts is "presumptively inadmissible").

*Sabin*, 614 N.W.2d at 899 & n.10 (emphasis added); *accord Tutton*, 354 S.C. at 331, 580 S.E.2d at 192 (citing this portion of *Sabin* with approval after making a similar observation).

This third type of common scheme or plan is, in my view, what is represented in the case before us. I see the convergence of similarities as objective indicia of the concurrence of common features that would demonstrate a logical connection—a common system—between the charged and uncharged acts. *See Bell*, 302 S.C. at 28–29, 393 S.E.2d at 370; *Tutton*, 354 S.C. at 328, 580 S.E.2d 191; 2 *Wigmore on Evidence* § 304.

## D.

As discussed previously, the hallmark of the common scheme or plan exception is that the charged and uncharged crimes are connected in the mind of the actor by some common purpose or motive. *See, e.g.*, *Molineux*, 61 N.E. at 299. Thus, as with the *modus operandi* exception where identity is interwoven with common scheme or plan, motive can also be inextricably intertwined with a common scheme or plan. *See Cutro*, 365 S.C. at 375, 618 S.E.2d at 895 (finding the evidence established both motive and a common scheme or plan); *Bell*, 302 S.C. at 29–30, 393 S.E.2d at 370 (same); Rule 404(b), SCRE (listing motive as another of the exceptions to the prohibition on propensity evidence); *cf. Molineux*, 61 N.E. at 301 (declining to find the common scheme or plan exception applied because, although the two victims were killed in similar fashions, the motive behind each murder was entirely distinct: one murder was in retaliation for the victim's "interfere[nce] in the defendant's love affair," whereas the other murder occurred after the victim "had incurred the hatred of the defendant as the result of quarrels between them over [athletic] club matters"; and concluding if the same person had committed both murders, "*he was employing similar means [i.e., poisoning the victims] for different ends* or for some common purpose not disclosed by this record. The methods referred to are as identical as any two shootings, stabbings or assaults, but no more so." (emphasis added)).

In South Carolina, "evidence of motive is admissible as relevant and need not be necessary to the State's case." *State v. Cheeseboro*, 346 S.C. 526, 547,

552 S.E.2d 300, 311 (2001) (citing *Bell*, 302 S.C. at 29, 393 S.E.2d at 370); *Bell*, 302 S.C. at 29–30, 393 S.E.2d at 370 (declining to find error in a death penalty case in which evidence was admitted tending to show a possible sexual motive underlying the kidnapping and murder of the victim, despite the fact that the defendant's motive was already inferable from the manner in which he dressed the victim postmortem); *cf. State v. Braxton*, 343 S.C. 629, 636, 541 S.E.2d 833, 836–37 (2001) (explaining in homicide cases that evidence of previous quarrels and ill feelings or hostile acts between the parties is admissible to show that animus probable existed between the parties at the time of the homicide).

Here, I would find Stepdaughter's testimony admissible to demonstrate both Petitioner's motive and his common system of sexually abusing the daughters in his home. His alleged abuse of Stepdaughter and Daughters Two and Three are so "related to each other as to show a common motive or intent running through both." *See Molineux*, 61 N.E. at 299. Petitioner's actions clearly fall within the third type of common scheme or plan case, in which an "individual devises a plan and uses it repeatedly to perpetrate separate but very similar crimes." *Gresham*, 269 P.3d at 214 (citation omitted). Despite the majority's assertions to the contrary, the State did not offer Stepdaughter's testimony to show Petitioner's propensity to sexually molest his daughters; rather, the State offered this evidence to "show that [Petitioner] ha[d] developed a plan and ha[d] again put that particular plan into action." *Id.* (internal quotation marks omitted); *accord Tutton*, 354 S.C. at 325–31, 580 S.E.2d at 189–93; 2 *Wigmore on Evidence* § 304 ("[T]he effort is to establish a definite prior design or system which included the doing of the act charged as part of its consummation. . . . *[T]he result is to show (by probability) a precedent design which in its turn is to evidence (by probability) the doing of the act designed*." (emphasis added)). The majority focuses on *Wallace* and its touting of the need for similarity only between the charged and uncharged acts. Yet the concurrence of common features between Petitioner's abuse of Stepdaughter and Daughters Two and Three—detailed by the court of appeals, as well as above—not only is what makes Stepdaughter's testimony relevant by showing the events were connected, it helps corroborate the State's theory that "the charged act[s] occurred" at all. *Sabin*, 614 N.W.2d at 899 & n.10 ("The jury is not required to draw an inference regarding the

defendant's character.  Rather, the jury is asked to infer the existence of a common system and consider evidence that the defendant used that system in committing the charged act as proof that the charged act occurred."); *accord Rainey*, 175 A.3d at 1188; *Gresham*, 269 P.3d at 215.  Likewise, I find Petitioner's threats to all three victims particularly important to tying together the evidence into a common scheme or plan.  *See Tutton*, 354 S.C. 333 n.6, 580 S.E.2d at 194 n.6 (opining that, had the defendant been related to the victims and played on their fears of breaking up the family in order to silence them, it made a "far more compelling" case for finding a common scheme or plan (citing *Sabin*, 614 N.W.2d at 901)).

## VI.

As a final note, the South Carolina Commission on Indigent Defense recently acknowledged in its brief to this Court in *Cotton*, "Prior bad act testimony is needed in child sexual abuse cases because children often have difficulties in communicating such information.  *This fact is also significant because most of these cases involve child molesters whose behavior is often repetitive and thus lends itself to easily establishing a pattern*."  (Emphasis added.)  The court of appeals made a similar observation in *Tutton*, stating:

> [C]ommon scheme or plan evidence in criminal sexual conduct cases will be admitted on a generalized basis only where there is a pattern of continuous illicit conduct.  Sex crimes may be unique in this respect because they commonly involve the same victims engaged in repeated incidents occurring under very similar circumstances.  The reason for the general admissibility of such evidence under these circumstances is self[-]evident—where there is a pattern of continuous conduct shown, that pattern clearly supports the inference of the existence of a common scheme or plan, thus bolstering the probability that the charged act occurred in a similar fashion.
>
> . . . Where there is a pattern of continuous misconduct, as commonly found in sex crimes, that pattern supplies the necessary connection to support the existence of a plan.

> Presumably, this is so because the same evidence that establishes the continuous nature of the assaults will generally suffice to prove the existence of the common scheme or plan as well.

354 S.C. at 328, 580 S.E.2d at 191.

While of course evidence of general pedophilic tendencies, in and of itself, would not be admissible to show a common scheme or plan,[36] when that evidence demonstrates some sort of "logical connection" between the victims—whether due to their relationship with one another or the defendant, or via the concurrence of similar features of their allegations of abuse, or (particularly) both—I believe the admissibility threshold for such evidence has been met to show a common system. This is not to say the bar for admissibility is set lower for cases involving pedophilia; rather, exactly as the Commission on Indigent Defense has phrased it, child molesters' behavior is often repetitive and lends itself to establishing a pattern.[37]

---

[36] *See, e.g.*, *Nelson*, 331 S.C. at 6–7, 501 S.E.2d at 719 (holding inadmissible evidence the defendant possessed stuffed animals, children's television shows, and pictures of children unrelated to the victim because the only possible relevance to those items—unconnected as they were to the victim—was to "reflect[] on an aspect of Petitioner's character, i.e. that he is a pedophile").

[37] This is perhaps best reflected by the fact that there are very few crimes that have a separate, designated mental health disorder classification pursuant to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V). Nonetheless, certain sex crimes, such as criminal sexual conduct with a minor (via pedophilia), have made the short list of those crimes singled out for a specific diagnosis in the psychiatric community. *Cf.* S.C. Code Ann. § 44-48-30(1) (2018) (defining a sexually violent predator as a person who "has been convicted of a sexually violent offense; and [] suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment"); *Bowden v. State*, 538 So. 2d at 1226, 1240 (Ala. 1988) (Maddox, J., concurring in part and dissenting in part) ("All indications are that persons who engage in sexual misconduct, especially child abuse, have an abnormality that motivates them to commit these acts; therefore, proof of other sexual crimes would tend to show this motivation.").

Nonetheless, it bears emphasis that finding a common scheme or plan exists is not dispositive on the question of admissibility. Rule 403 is an independent hurdle the evidence must overcome to be found properly admissible. Regardless of the logical relevance of the evidence, Rule 403 prohibits the admission of evidence when its probative value is substantially outweighed by the danger of unfair prejudice. Too often, trial courts conflate Rule 404(b) and Rule 403, without making a focused and meaningful evaluation of the potential danger of unfair prejudice. A Rule 403 analysis is an independent step in making the ultimate admissibility determination. Where a trial court determines that proffered evidence satisfies a Rule 404(b) exception, the decision on admissibility cannot be made until a Rule 403 balancing is conducted. Trial courts (and appellate courts) must be vigilant not to treat Rule 403 in a cursory manner. The importance of the trial courts' gatekeeping role under Rule 403 cannot be overstated, especially where Rule 404(b) evidence is sought to be introduced.

## VII.

Because I would affirm Petitioner's convictions and sentences,[38] I respectfully dissent.

**JAMES, J., concurs.**

---

[38] I would dismiss the balance of Petitioner's certiorari petition as improvidently granted.